**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DONNA COLLINS, MARY NARCAVISH, DIANA REED, DIANNE ROSE, TERRI WELCH,<br><br>Plaintiffs,<br><br>v.<br><br>KINDRED HOSPITALS EAST, LLC, ALSO KNOWN AS KINDRED HOSPITAL HERITAGE VALLEY, A DELAWARE CORPORATION<br><br>Defendants. | )<br>)<br>)<br>)<br>)    Civ. A. No. 14-17<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**OPINION**

CONTI, Chief District Judge

## I.    INTRODUCTION

Plaintiffs Donna Collins ("Collins"), Mary Narcavish ("Narcavish"), Diana Reed ("Reed"), Dianne Rose ("Rose"), and Terri Welch ("Welch" and collectively with Collins, Narcavish, Reed, and Rose "plaintiffs") accuse their former employer, Kindred Hospitals East, LLC, also known as Kindred Hospital Heritage Valley[1] ("Kindred" or the "hospital"), of discriminating against them in various ways in violation of the Pennsylvania Human Relations Act, 43 PA. CONS. STAT. §§ 951-963 (the "PHRA").

Collins, Narcavish, Reed, and Rose initiated this action on December 2, 2013, by filing a complaint in the Court of Common Pleas of Beaver County. (ECF No. 1). Kindred removed the case to this court on diversity grounds. (*Id.*). Plaintiffs amended their complaint on June 11,

---

[1] Although plaintiffs refer to "defendants" in the caption, there is only one defendant with multiple names.

2014 to add Welch as a plaintiff.  (ECF No. 22).

Presently before the court is Kindred's motion for summary judgment with respect to all claims by asserted by all plaintiffs.  (ECF No. 39).  Kindred also filed a brief in support of its motion, (ECF No. 40), a concise statement of material facts, (ECF No. 41), an appendix, (ECF No. 42), a reply brief, (ECF No. 45), and a supplemental appendix, (ECF No. 46).  In response to the motion, plaintiffs filed an opposition brief, an appendix, and a responsive statement of material facts that responded to Kindred's concise statement of material facts.  (ECF Nos. 43-44).  The parties also jointly submitted a combined concise statement of material facts.  (ECF No. 47).

The matter is fully briefed and ripe for disposition.  For the reasons that follow in this memorandum opinion, Kindred's motion will be granted in full and judgment will be entered against all plaintiffs on all claims.

## II.   <u>FACTUAL BACKGROUND</u>

All material facts set forth below are undisputed unless otherwise indicated.  Additional material facts may be discussed elsewhere in this memorandum opinion, in context.  The parties' combined concise statement of material facts ("CCSMF") is docketed at ECF No. 47 and is cited to that docket number.  All reasonable inferences are drawn in favor of plaintiffs, the nonmoving parties.  Inferences based upon speculation or conjecture, however, do not create a material factual dispute sufficient to defeat a motion for summary judgment.  *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

### A.  <u>Plaintiff Donna Collins</u>

Collins, who is African-American and female, began working at Kindred in 2004 as a

licensed practical nurse. (ECF No. 47 ¶¶ 4, 6). On April 22, 2012, Harry Buntman ("Buntman"), another Kindred employee at the time, told several other employees that he was going to "write [Collins] up" for taking a break without clocking out. (*Id*. ¶ 8). Although Buntman worked as a nursing supervisor occasionally, he was not Collins's supervisor on this particular date. (*Id*. ¶ 8). Later the same day, Buntman interrupted two of Collins's breaks and directed her to check on her patients. (*Id*. ¶ 9). In both instances, Collins believed that her patients were being cared for by other personnel and that the situations did not warrant interruption of her breaks. (*Id*. ¶ 10). Collins nevertheless ended her breaks early and checked on her patients. (*Id*. ¶ 11). Buntman and Collins had a confrontation. Buntman accused Collins of lying about being on break. (*Id*. ¶ 12). For the remainder of the day Buntman watched Collins and asked her patients about the quality of the care they were receiving. (*Id*. ¶ 13). Collins was not disciplined or counselled for the events that took place on April 22, 2012. (*Id*. ¶ 14). Buntman did not engage in similar conduct after April 22, 2012. (*Id*. ¶ 15). Prior to that date Collins had never made a complaint about Buntman. (*Id*. ¶ 16).

On another occasion, Amber Hodnick ("Hodnick"), a Kindred employee, referred to Collins using a racial slur.[2] (*Id*. ¶ 17). When Collins confronted her, Hodnick told her she was just reciting a quote from a movie. (*Id*. ¶ 18). To Collins's knowledge, Hodnick did not use the racial slur again. Collins admits she did not report the incident. Collins, however, avers that she did not report the incident because Hodnick was her supervisor and the comment was made in the presence of many others. (*Id*. ¶ 19).

Collins testified that she witnessed Buntman assign two African-American aides

---

[2] Throughout the Factual Background, unless a specific date or timeframe is given for specific incidents or conduct, the record did not reflect a date or timeframe.

additional work when other aides were available. (*Id.* ¶ 20). Although Collins avers she told the aides to report the conduct, neither Collins nor anyone else reported the incident. The two African-American aides eventually quit their jobs. (*Id.* ¶ 21).

The record is somewhat ambiguous with respect to Collins's current status at Kindred. She continued to work there until February 2015. (*Id.* ¶ 24). The parties state in their CCSMF that she voluntarily resigned at that time. (*Id.* ¶ 24). Collins, however, testified that she is still technically on staff, but no longer assigned to any shifts because Kindred now has almost no patients.[3] (ECF No. 42-3 at 4-7 (Collins Depo. at 20:1-24:25)). Collins testified that she attained a new job elsewhere. (*Id.*). Her new job is fulltime, includes benefits, and pays slightly more per hour than she was making at Kindred. (*Id.*).

Collins suffered stress as a result of the above incidents at work. (ECF No. 47 ¶ 27). She admitted that other factors outside of work contributed to her stress and that she continued to feel stressed after starting her new job, but testified that her stress was reduced after Buntman was fired from Kindred. (*Id.* ¶¶ 28, 30). With respect to treatment, Collins testified that she discussed the stress with her primary care physician on several occasions, but declined medication and never received counselling. (ECF No. 42-3 at 34-35 (Collins Depo. at 119:14-120:3)).

### B. Plaintiff Mary Narcavish

Narcavish, is a female and was fifty-three years old at the time she began working as a supervisor at Kindred on November 25, 2002. (ECF No. 47 ¶¶ 31, 33). On December 2, 2011, at the age of sixty-two, Narcavish was terminated. (*Id.* ¶ 32).

---

[3] Collins avers in the CCSMF that she resigned, in part, because Kindred would sometimes incorrectly schedule her off. (ECF No. 47 ¶ 24). The deposition testimony cited, however, does not support the suggestion that this improper scheduling contributed to her resignation. (*See* ECF No. 44, Ex. 1 (Collins Depo. at 113:1-14:21)).

Narcavish witnessed Buntman make "off-color remarks", generally regarding women, on multiple occasions. (*Id*. ¶ 37). She spoke with Buntman about his comments and he changed his behavior, at least in her presence. (*Id*. ¶ 39).

A night supervisor, Jeanie Shingleton ("Shingleton"), made a number of racially charged comments about African-Americans, including using the "n-word" and referring to an African-American patient as a "gorilla" and Kindred's African-American CEO as a "little monkey." (*Id*. ¶ 40). While she is not African-American, Narcavish found these comments offensive and told Shingleton to stop. (*Id*.). She reported the comments to a member of management, Janie Rosenberger ("Rosenberger") and the CEO, Rodney Jones ("Jones"), who laughed and indicated that he was not offended so she should not be either. (*Id*.). Jones nevertheless agreed that there would be zero tolerance going forward; Shingleton, however, continued making the comments. (*Id*.).

Narcavish avers that Rosenberger targeted other employees whom she did not like, including attempting to get them to quit and criticizing them to their faces and talking about them behind their backs. (*Id*. ¶¶ 42-43). Narcavish testified that Rosenberger eventually began targeting her by criticizing her for making typographical errors in a report. (*Id*. ¶¶ 43-44). Narcavish testified that she was removed as charge nurse, and assumes Rosenberger was behind it, but did not know for sure. (ECF No. 44, Exhibit 2, (Narcavish Depo. at 17:4-17)). At different times in her deposition, Narcavish testified in a contradictory manner. At one point she testified that she did not know why she was fired. (ECF No. 44, Ex. 2, (Narcavish Depo. at 43:2)). At another point she testified that she was fired for discussing patient care with Kindred's medical director (ECF No. 42-4 at 23-24 (Narcavish Depo. at 145:24-46:8)).

During her employment at Kindred, Narcavish received a number of verbal and written warnings for various kinds of misconduct, although she denied or explained each warning during her deposition. (*Id*. ¶ 47). Despite these warnings, Rosenberger said that Narcavish was viewed as a skilled clinical nurse. (*Id*. ¶ 48). Around September 2011, Narcavish was nominated for and won the Western Pennsylvania Cameo for Caring Award. (*Id*. ¶ 49). Nominations for this award are made by an employee's peers, but the winner is chosen by the senior leaders at the Kindred Heritage Valley facility. (*Id*. ¶ 50). An award dinner is held to honor the winner, which Kindred always treated as not only a time to recognize the recipient, but also as a marketing opportunity. (*Id*. ¶ 52). The parties dispute how many tickets Narcavish received for the event, but she testified that Rosenberger gave two tickets that should have gone to Narcavish to other employees, who typically would become drunk at the event. (*Id*. ¶ 53-57). In protest, Narcavish did not attend the event. (*Id*.).

The parties agree that the relationship between Narcavish and Jones and Rosenberger deteriorated following the award dinner, but do not agree on who was to blame. (*Id*. ¶¶ 53, 58-59). Rosenberger claims to have begun receiving complaints from other employees about Narcavish refusing to help out, reading the newspaper at the nurses' desk, and using the computer for personal use. (*Id*. ¶ 59). Narcavish denies these allegations and testified that following the award dinner Jones and Rosenberger either refused to speak to her or began calling her into meetings to yell at her. (*Id*. ¶¶ 53, 59). Rosenberger and another member of Kindred management, Amy Egan ("Egan"), called Narcavish into a meeting, which they describe as a "coaching session" to discuss her recent issues. (*Id*. ¶ 60). Narcavish takes the position that the true purpose of this meeting was to further criticize and berate her. (*Id*. ¶¶ 46, 53, 60).

Narcavish refused to go into the meeting without a witness.  (*Id*. ¶¶ 46, 61-62).  She continued to refuse and was suspended.  (*Id*. ¶¶ 46, 64).

On November 29, 2011, after her suspension, Narcavish met with Rosenberger and Egan and was placed on a thirty-day performance improvement plan.  That plan identified various ways in which she was expected to improve her behavior, including demonstrating a more positive leadership attitude.  (*Id*. ¶ 65).  Rosenberger testified that on November 30, 2011, and December 1, 2011, Jones received complaints about Narcavish's attitude, including one from the medical director; Narcavish denies having a bad attitude.  (*Id*. ¶ 66).  According to Rosenberger, Jones and Egan attempted to meet with Narcavish to discuss the complaints.  (*Id*. ¶¶ 67-74).  Rosenberger attested that Narcavish again refused to meet without a witness present and that Jones refused to allow Narcavish to have a witness and informed her she was not entitled to have a witness present and that continuing to refuse to meet was insubordination and would result in her termination.  (*Id*.).  Narcavish continued to refuse to meet, and proceeded to pull out her phone and threatened to call her attorney.  (*Id*.).  After she continued to refuse to meet, Jones terminated her employment.  (*Id*.).  Narcavish's version of these events is that the medical director did not complain about her, but that she informed him about patient abuse issues that had occurred the prior night.  (*Id*. ¶ 46).  She testified that she had previously been warned by Jones and Rosenberger not to report issues to the medical director so he would not "harp" to them about it.  As a result, she alleges she was called into the meeting with Jones and Egan during which Jones began screaming at her "out of control" and eventually fired her.  (*Id*.).

Narcavish testified that Rosenberger made at least two derogatory comments regarding her age, including saying "[y]ou're too old for this or that. I don't know why doctors love you

because you're old." (*Id*. ¶¶ 35, 76). Narcavish did not tell Rosenberger that these comments offended her or report them to anyone else at Kindred. (*Id*. ¶ 77).

Narcavish suffered emotional distress as a result of the above events at Kindred. (*Id*. ¶ 78). She has a long history of depression and anxiety. (*Id*. ¶ 79). Approximately a year and a half after her termination, Narcavish saw a psychiatrist for three visits. (*Id*. ¶ 80). Following her termination she looked for other employment, but was unsuccessful in obtaining another fulltime job. (*Id*. ¶ 81). In 2013 she began receiving social security and has not sought employment since that time. (*Id*. ¶ 82).

## C. Plaintiff Diana Reed

Reed began working at Kindred in October 2006. (*Id*. ¶ 84). In 2010, she was promoted to education/employee health nurse, which is a supervisory position. (*Id*. ¶¶ 85-86). Reed contends that while employed at Kindred she received unwarranted discipline on the basis of her sex. (*Id*. ¶ 89). Kindred takes the position that all discipline was issued as a result of violations of hospital policy by Reed. (*Id*. ¶ 90). Reed argues that the discipline was unwarranted and discriminatory because of her sex and in retaliation for her reporting incidents of sexual harassment. (*Id*. ¶¶ 88-89). Reed admits that she committed multiple time card violations; Rosenberger puts the number of missing time card punches at forty-two between January 21, 2011, and November 1, 2011. (*Id*. ¶¶ 91-92). On November 4, 2011, Reed received a written warning for multiple missed punches in violation of Kindred's timekeeping policy. (*Id*. ¶ 93). Two other female employees, Cathy Coveny ("Coveny") and Tracey Barker ("Barker") had missed punches, but had their time cards automatically corrected in lieu of discipline. (*Id*. ¶ 94).

Reed alleges that she "opposed discrimination" by reporting an alleged sexual affair

between two employees, complaining that Rosenberger did not keep employee information private, and by reporting that a supervisor used the "n-word." (*Id*. ¶ 96). In addition to discrimination, Reed reported patient mistreatment. (*Id*. ¶ 97).

After a meeting with Rosenberger, Reed's responsibilities at Kindred increased. (*Id*. ¶ 101). The new responsibilities included adding educational materials to the bulletin board and putting together a newsletter. She felt these activities were not her responsibility, although she admitted having prepared the newsletter before. (*Id*. ¶¶ 103-104). On February 28, 2012, Reed submitted a letter to Egan resigning as education/employee health nurse, but requested to remain in an "as needed" position. (*Id*. ¶ 105). Reed resigned to begin employment at another healthcare facility where she is currently earning more than she did while at Kindred. (*Id*. ¶ 106). Reed testified that her daily work environment at Kindred caused her significant stress, but she did not undergo any treatment for mental or emotional distress. (*Id*. ¶ 107).

### D. Plaintiff Dianne Rose

Rose, a female, began working at Kindred on or about December 19, 2005. (*Id*. ¶ 108). Rose alleges that Buntman made a number of sexually harassing comments. (*Id*. ¶ 111). In one incident, Buntman and she were discussing a "sticky-note" when Buntman stated that he thought the note said "Harry's stiff." (*Id*. ¶ 112). Rose testified that a supervisor was present for this comment so she did not report it. (*Id*. ¶ 113). In another incident, Rose commented in front of Buntman that her eyes were getting worse. Buntman asked if she had said her "ass was getting worse," and agreed that her "ass" was "just fine." (*Id*. ¶ 114). Rose did not report this comment. (*Id*. ¶ 115). Buntmant made a comment about a former coworker's chest. (*Id*. ¶ 116). Rose also did not report this comment. (*Id*. ¶ 117). Buntman made another comment stating that he

thought only "woman can go down," which Rose interpreted as being a reference to oral sex. (ECF No. 44, Ex. 4 (Rose Depo. at 64:3-21)).  She claims that this comment was made in the presence of Narcavish and she reported it to Narcavish.  (*Id*.).  Rose testified that she was treated differently with respect to work schedules.  (ECF No. 47 ¶ 118).  She identified several male and female employees who she alleges received more favorable work schedules.  (*Id*. ¶ 119).

Narcavish witnessed Buntman make an inappropriate comment in the presence of Rose in November 2011.  (*Id*. ¶ 120).  Rose believes that she was terminated based upon her reporting this comment to Narcavish and her reporting of other instances of Buntman's harassing conduct. (*Id*. ¶ 121).  Kindred takes the position that Rose was terminated for poor performance and Rosenberger testified that Rose received several written warnings and performance improvement plans, some for rendering poor patient care, during her time at Kindred.  (*Id*. ¶¶ 122-34).  She admits to having received most of the warnings, but denies having done the underlying conduct in several cases.  (*Id*.).  The final warning was issued January 24, 2012, and resulted in her discharge.[4]  (*Id*. ¶ 133).  Kindred said Rose refused to medicate a patient, an allegation she denies.  (*Id*. ¶¶ 134-38).  On March 6, 2012, over a month after her termination, Rose called Kindred's compliance hotline for the first time to make a formal complaint of sexual harassment. (*Id*. ¶ 140).

### E.  Plaintiff Terri Welch

Welch, who is female, was hired by Kindred as a licensed practical nurse in June 2004, at the age of 51.  (*Id*. ¶ 142).  Kindred's policy is that nurses are not allowed have their cell phones while on duty and Welch testified that she was not allowed to use her cellphone during her shifts,

---

[4] The exact date of Rose's discharge is not clear from the record, but occurred sometime between January 24, 2012 and early February 2012.

except for emergencies. (*Id*. ¶¶ 144-47). Welch testified that another female employee, under the age of 40, was permitted to use her cellphone while working. (*Id*. ¶ 146). Welch similarly testified that she was held to Kindred's policy allowing nurses to eat only during designated breaks while two other female nurses were permitted to eat outside of their designated breaks. (*Id*. ¶¶ 148-50). She does not know their exact ages, but testified that one was in her forties or early fifties and the other was in her forties. (ECF No. 42-8 at 8 (Welch Depo. at 24:2-14)). Welch was held to Kindred's policy requiring her to clock-in and out for lunch breaks while other employees were not. (ECF No. 47 ¶¶ 151-52). Welch was not permitted to smoke on breaks while two other employees in their forties or early fifties were so permitted. (*Id*. ¶¶ 153-54). Welch testified to receiving unfavorable schedules and complained to Jones about it. (*Id*. ¶ 155). Welch alleges that Buntman made one inappropriate comment to her stating that "I want to wipe the lint off your butt" and asking if she wanted to see his vasectomy scar. (*Id*. ¶ 156). Buntman also micromanaged her, assigned her patients that required walking greater distances, and said she had anger issues. (*Id*. ¶ 156). Welch made a complaint about Buntman to Kindred's compliance hotline. (*Id*. ¶ 156).

On September 5, 2012, Welch wrote to Kindred indicating that she was quitting her fulltime positon and requesting her status be changed to "PRN" or "as needed" so she could start working a new nursing job elsewhere. (*Id*. ¶¶ 157-58). This request was evidently granted. Welch's PRN status was terminated on August 22, 2013, because she did not work at least one shift per month which Kindred claims is policy. (*Id*. ¶¶ 159-60). Welch testified that no one ever told her about the one shift per month requirement. (*Id*. ¶¶ 159-60). Welch claims to have suffered stress and anxiety as a result of working at Kindred. (*Id*. ¶ 163).

## III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the record shows that there is no genuine dispute with respect to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment. Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Even then, the dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. *Id.* at 248–49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. *Liberty Lobby,* 477 U.S. at 255; *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir.2007); *Woodside v. Sch. Dist. of Phila. Bd. of Educ.,* 248 F.3d 129, 130 (3d Cir.2001); *Doe v. Cnty. of Centre, PA,* 242 F.3d 437, 446 (3d Cir.2001); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 151 (3d Cir.1999). A court must not engage in credibility determinations at the summary judgment stage. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 643 n. 3 (3d Cir.1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24 (1986). The summary judgment inquiry asks whether there is a need for trial—"whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Liberty Lobby,* 477 U.S. at 250. In

ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150–51 (2000) (citing decisions); *Liberty Lobby,* 477 U.S. at 248–49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. *Celotex,* 477 U.S. at 323; *Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080 (3d Cir.1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. *Marten v. Godwin,* 499 F.3d 290, 295 (3d Cir.2007) (citing *Celotex,* 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more those elements. *Celotex,* 477 U.S. at 322–23. Once the movant meets that burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Fed. R. Civ. P. 56(e); *see Liberty Lobby,* 477 U.S. at 247–48; *Celotex,* 477 U.S. at 323–25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. *Liberty Lobby,* 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574,

586 (1986).   To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.   Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner,* 247 F.App'x 353, 354 (3d Cir.2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.,* 311 F.3d 226, 233 (3d Cir.2002)).

## IV.   <u>DISCUSSION</u>

Each of plaintiffs' respective claims is brought pursuant to the PHRA.   The court notes that the amended complaint and plaintiffs' other filings are not always entirely clear with respect to what kinds of discrimination claims each plaintiff brings.

### A.   <u>Plaintiff Donna Collins</u>

Collins appears to bring two claims: (1) a discrimination claim for disparate treatment on the basis of her race; and (2) a hostile work environment claim also based on her race.[5]   (*See* ECF No. 43 at 2-5).

### i.   <u>Race Discrimination Claim</u>

Discrimination claims brought under the PHRA are treated the same as Title VII and ADEA claims.   *See e.g.*, *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). Discrimination claims based upon circumstantial evidence are analyzed using the burden-shifting framework developed by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   The *McDonnell Douglas* framework calls for a three-step, burden-shifting analysis.

---

[5] Some of Collins's briefing suggests her hostile work environment claim also has a sex component; however, she did not adduce any evidence of discrimination on the basis of sex.

The plaintiff has the initial burden to establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. After the plaintiff establishes a prima facie case for discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *Id.* For the defendant to carry this burden, the defendant must "clearly set forth" a nondiscriminatory reason. *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 255 (1981). If the defendant meets this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext of discrimination." *Id.* at 253 (citing *McDonnell Douglas*, 411 U.S. at 804).

Specifically, in order to establish a *prima facie* case, a plaintiff must prove that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of unlawful discrimination. *Jones v. School Dist. of Phila.*, 198 F.3d 403, 411-12 (3d Cir. 1999).

If a plaintiff can establish a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for its action. The burden of production is light. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994) (citation in the original).

If the defendants meet their burden of production by showing a legitimate, nondiscriminatory reason for the challenged action, the burden shifts to the plaintiff to demonstrate that the defendants' alleged reasons are a pretext for discrimination. *Burdine*, 450 U.S. at 253. For the plaintiff to meet this burden, the plaintiff must show "'*both* that the reason

was false, *and* that discrimination was the real reason.'" *Fuentes*, 32 F.3d at 763 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). To survive a motion for summary judgment, a plaintiff must satisfy at least one of the two prongs formulated by the United States Court of Appeals for the Third Circuit in *Fuentes*:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the [defendant's] articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764.

It is not disputed that Collins satisfied the first two steps of a prima facie case of discrimination. As an African-American, she is a member of a protected class and there is no contention that she was in any way unqualified for her job. Kindred, however, argues that Collins did not suffer an adverse employment action, and even if she did, the circumstances of the adverse action do not give rise to an inference of race discrimination. (ECF No. 45 at 3-4).

Collins points to two possible adverse employment actions. First, she was given an undesirable work schedule and taken off shifts, which resulted in a financial loss since she was paid on an hourly basis. (ECF No. 43 at 2-3). Second, Buntman's disrupting of her shifts made it difficult to perform her work. (*Id.*). An adverse employment action is that which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004). However, Title VII and the PHRA "do not provide relief for unpleasantness that may be encountered in the work place. Rather [the statutes] provide a remedy only if discrimination seriously and tangibly altered the employee's ability to perform the job or impacted the employee's job benefits." *Walker v. Centocor Ortho Biotech, Inc.,* 558 Fed.App'x 216, 219 (3d Cir.

2014) (citing *Storey,* 390 F.3d at 764).

The actions taken by Buntman on April 22, 2012, do not rise to the level of an adverse employment action. At worst, Buntman interrupted two of Collins's breaks, threatened to write her up, and watched her closely for the remainder of the day. (ECF No. 47 ¶¶ 8-13). Collins, however, admits that she never received any discipline stemming from these events. (*Id*. ¶ 14). She admits the events were limited to April 22, 2012, and never reoccurred. (*Id*. ¶¶ 15-16). Collins admits she continued to work at Kindred for nearly three more years. (*Id*. ¶ 24). An action can constitute an adverse employment action if it "substantially decreases one's earning potential or disrupts his working conditions." *Swain v. City of Vineland*, 457 F.App'x 107, 110 (3d Cir. 2012) (citing *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 144 (3d Cir. 1999)). Given Collins's admissions and that the conduct did not affect her employment status, compensation, benefits, or job responsibilities, the actions taken by Buntman on April 22, 2012, do not constitute an adverse employment action.

On the other hand, the allegations that Collins was discriminatorily taken off of shifts might constitute an adverse employment action if supported by the record. The court, however, concurs with Kindred that they are not. The only reference to adverse scheduling is a brief mention in Collins's deposition testimony. (*See* ECF No. 44, Exhibit 1 (Collins Depo. at 113:1-14:21)). Collins testified only that "[t]he only way I can answer that is if you look at our schedules and you can see when there was time when I was flexed out when I wasn't supposed to be flexed out. That's the only way I can explain that, if I was flexed out off of a day or taken out of an assignment." (*Id*.). She goes on to say that Buntman did not do the scheduling and that she did not complain about her schedule. (*Id*.). The Third Circuit of Appeals has commented that

similarly vague deposition testimony, standing alone, was insufficient to survive summary judgment. *See e.g.*, *Smith v. Twp. of E. Greenwich*, 344 F.App'x 740, 747 (3d Cir. 2009) ([Plaintiff's] general assertion that 'just about everyone' had falsified reports without any specifics as to the who, what, or when of such allegations" was insufficient to prove the existence of comparators); *see Clair v. Agusta Aero. Corp.*, 592 F.Supp.2d 812, 823 n.19 (E.D. Pa. 2009) ("while [Plaintiff] testified generally at her deposition that [employer] yelled at her and treated her differently, she did not offer specific examples or other evidence of such treatment. At the summary judgment stage, such generalized allegations are deficient as a matter of law. . . . This is so because in their absence, [Plaintiff] fails to meet her burden of pointing to the existence of a genuine issue of material fact in the record.") (citing *Robinson v. Nat'l Med. Care Inc.*, 897 F.Supp. 184, 187 (E.D. Pa. 1995) (where plaintiff could not "recall the specific incidents")). The record contains no actual schedules or other evidence to support Collins's claim. Absent more, Collins's vague testimony does not create a material dispute of fact. The testimony does not reference a single specific incident or provide any indication of how often she was inappropriately scheduled off or how much money she lost as a result. In fact, it is only in Collins's briefs that she even explains that the scheduling issue may have cost her money. There is no allegation that the scheduling was done by someone who Collins claims discriminated against her because of her race. Even the amended complaint fails to mention the issue of adverse scheduling. (*See* ECF No. 22 at 3-6). The court is constrained to conclude that no reasonable jury could find the scheduling allegations constituted an adverse employment action because they are not supported by the record.

Since there was no evidence of record of an adverse employment action, Collins failed to

make out a prima facie case of race discrimination relating to either the events of April 22, 2012, or her allegations of unfair scheduling. Accordingly, Kindred's motion for summary judgment will be granted with respect to Collins's race discrimination claim.

## ii. Hostile Work Environment Claim

Title VII prohibits racial or sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986); *see AMTRAK v. Morgan*, 536 U.S. 101, 116 n. 10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standards as those based on sexual harassment."). To succeed on a hostile work environment claim, the plaintiff must establish that: 1) the employee suffered intentional discrimination because of his or her protected status; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of respondeat superior liability. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds by *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). The first four elements establish a prima facie hostile work environment case, and the fifth element establishes employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.,* 568 F.3d 100, 104 (3d Cir. 2009). "When the hostile work environment is created by a victim's non-supervisory coworkers, the employer is not automatically liable." *Id*. at 104 (citing *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293 (3d Cir. 1999)). Liability will only fall upon the employer in such a situation if the employer: (1) failed to provide a reasonable avenue for complaint; or (2) knew or should have known of the harassment and failed to make prompt and

appropriate remedial action.  *Id*.

To determine whether an environment is hostile, a court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 168 (3d Cir. 2013) (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993) and *Caver v. City of Trenton,* 420 F.3d 243, 262–63 (3d Cir. 2005)).  To survive summary judgment, a plaintiff must present some evidence that the workplace was permeated with discriminatory intimidation, ridicule, or insult that was so severe or pervasive that it altered the conditions of employment and created an abusive working environment. *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 116 (2002); *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 278–79 (3d Cir. 2001) (citing *Harris,* 510 U.S. at 21).

The court concludes that Collins failed to adduce sufficient evidence that the discriminatory conduct was severe or pervasive.  Collins's hostile work environment claim appears to consist of three kinds of discriminatory conduct: (1) racist comments; (2) Buntman's actions towards her on April 22, 2012; and (3) the incident where Buntman assigned tasks to two African-American aides who were already busy, even though there were white aides who were currently not occupied.  (ECF No. 43 at 3-4).  Collins, however, only testified to one comment where Hodnick referred to Collins using the "n-word," but Hodnick told Collins she was quoting a movie.  (ECF No. 47 ¶ 7).  While Collins attempts to use a comment testified to by another plaintiff, there is nothing in the record indicating Collins was aware of it.  Courts within the Third Circuit have often found that one or two isolated comments is insufficient to establish a

hostile work environment. *See Mufti v. Aarsand & Co., Inc.*, 667 F.Supp.2d 535, 545-50 (W.D. Pa. 2009) (collecting decisions); *see also Perry v. Harvey*, 332 F.App'x 728, 731-33 (3d Cir. 2009) (upholding district court's grant of summary judgment to employer where there was one racist comment and a handful of administrative complaints such as being denied a leave request); *Woodard v. PHB Die Casting*, 255 F.App'x 608, 608-09 (3d Cir. 2007) (upholding district court's grant of summary judgment to employer where over the course of three years a few racially charged comments were made to the plaintiff and KKK related graffiti had been spray-painted on the bathroom wall); *Morgon v. Valenti Mid-Atl. Mgmt*, No. CIV.A. 01-134, 2001 WL 1735260, at *3 (E.D. Pa. Dec. 14, 2001) (granting summary judgment for employer where plaintiff had been called the "n-word" once). In this case Collins could only testify to a single comment. The only other aspects of her claim, each of the events of April 22, 2012, and the incident involving the two aides, only occurred once.[6] The court must conclude that a reasonable jury could not find that these three incidents were severe or pervasive. Accordingly, Collins failed to adduce sufficient evidence to support her hostile work environment claim and Kindred's summary judgment motion will be granted with respect to that claim.

### B. **Plaintiff Mary Narcavish**

Although styled as one claim for "discrimination" in her amended complaint, Narcavish essentially brings four claims: (1) age discrimination; (2) sex discrimination; (3) hostile work environment; and (4) retaliation. (ECF No. 43 at 5-13).

### i. **Age Discrimination Claim**

Courts analyze age discrimination claims under the *McDonnell Douglas* burden-shifting

---

[6] These other events also fail to support a hostile work environment claim because they were not reported by Collins and Collins admits Buntman was not her supervisor on the date the events occurred.

framework.  *Davis v. Pittsburgh Pub. Sch.*, 930 F.Supp.2d 570, 596-99 (W.D. Pa. 2013).   In

order to recover for age discrimination, a plaintiff must show that her age was the but-for cause

of her termination.  *Gross v. FBL Fin. Serv.*, 557 U.S. 167, 174-78 (2009) (ADEA); *see also*

*Davis*, 930 F.Supp.2d at 596-99 (same rule applies to age discrimination claims brought under

the PHRA).  To establish a prima facie case of age discrimination a plaintiff must show: (1) she

is age forty or older; (2) she suffered an adverse employment action; (3) she was qualified for the

position at issue; and (4) she was replaced by an "employee who was sufficiently younger to

support an inference of discriminatory animus."  *Smith v. City of Allentown*, 589 F.3d 684, 689

(3d Cir. 2009).

Narcavish made out a prima facie case of age discrimination.  She is over age forty, she

suffered an adverse employment action when she was terminated, she was qualified for her

position, and she was replaced by Buntman who was in his mid-fifties while she was in her mid-

sixties.[7]  (ECF No. 44, Ex. 2 (Narcavish Depo. at 138:2-142:19)).  The burden then shifts to

Kindred to offer a legitimate, nondiscriminatory reason for her termination.  Kindred takes the

position that Jones fired Narcavish because of a number of past complaints, building to the

meeting in his office where Narcavish was insubordinate.  (ECF No. 42-5 at 2-4 (Rosenberger

Decl. ¶¶ 14-28)).  This reason satisfies Kindred's burden at the second step of the *McDonnell*

*Douglas* analysis.

Kindred argues that Narcavish fails her subsequent burden of showing that its proffered

legitimate, nondiscriminatory reasons were a pretext.  The court agrees.  As already discussed,

the United States Court of Appeals for the Third Circuit has developed a two-prong test that a

---

[7] For an age discrimination claim, the issue is whether the individual who replaced the plaintiff is sufficiently younger than the plaintiff, and can be satisfied even if the replacing individual is also older than 40.  *See e.g.*, *Davis v. Pittsburgh Pub. Sch.*, 930 F.Supp.2d 570, 600 (W.D. Pa. 2013).

plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Fuentes*, 32 F.3d at 764; *see Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintff's evidence rebutting the employer's proffered legitimate non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext)."). The two prongs of the *Fuentes* test are distinct. The court, where appropriate, will analyze both prongs of the *Fuentes* test to determine whether sufficient evidence was presented by plaintiff to defeat defendant's motion for summary judgment.

To satisfy the first prong of the pretext analysis, "the non-moving plaintiff must demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [defendant's] proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" *Fuentes,* 32 F.3d at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff may not "'simply show that the [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108–09 (3d Cir.1997) (quoting *Fuentes,* 32 F.3d at 765). A plaintiff need not necessarily, however, produce additional evidence beyond that required by the prima facie case. *Fuentes*, 32 F.3d at 764.

With regard to the first prong from *Fuentes*, Narcavish makes no attempt to refute the suggestion that she was fired for insubordination in Jones's office, and even admits having done the behavior that Jones considered insubordinate. In fact, it is not entirely clear Narcavish even testified that she believed her age was the reason for her termination. (*See id*. at 138:13-18). At other times in her deposition, Narcavish testified that she did not know why she was fired (*Id*. at 43:2), and that she was fired for discussing patient care with Kindred's medical director (*Id*. at 145:24-46:8), something which would not be a violation of the PHRA. The fact that she was nominated for and awarded what she herself describes as "basically nurse of the year" award three months prior to her termination further belies her allegations of age discrimination. She admits her relationship with Jones and Rosenberger deteriorated immediately following the kerfuffle over the number of tickets she would receive and her subsequent refusal to attend the dinner (ECF No. 47 ¶¶ 53, 58-59), suggesting motivations that had nothing to do with her age or sex. Narcavish failed to demonstrate that a factfinder could reasonably disbelieve Kindred's articulated legitimate reasons.

The second *Fuentes* prong permits a plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 762. The kinds of evidence relied upon by the court of appeals under this prong of the *Fuentes* analysis are: 1) whether the defendant previously discriminated against the plaintiff; 2) whether the defendant has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the defendant has treated more favorably similarly situated persons not within the protected class. *Simpson*, 142 F.3d at 644-45.

With regard to the second prong, there is no evidence of (1) previous age discrimination against Narcavish; (2) age discrimination against other persons by management; or (3) anyone similarly situated who was treated more favorably than Narcavish. Besides being replaced by Buntman who was younger (although still in his fifties), the only other evidence of animus on the basis of age is one comment by Rosenberger where she told Narcavish "[y]ou're too old for this or that. I don't know why doctors love you because you're old." (ECF No. 47 ¶¶ 35, 76); (*see also* ECF No. 44, Ex. 2 (Narcavish Depo. at 141:24-142:12)). Rosenberger, however, was not the person who terminated Narcavish and no timeframe was adduced for Rosenberger's comment. *See Parker v. Verizon Pa. Inc.*, 309 F.App'x 551, 558-59 (3d Cir. 2009) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.") (quoting *Fuentes*, 32 F.3d at 767).

Narcavish failed to satisfy either prong of the *Fuentes* test and based on the record no reasonable jury could find Kindred's proffered reasons for her termination were a pretext for age discrimination. Kindred's summary judgment motion must be granted with respect to her age discrimination claim.

### ii.  Sex Discrimination Claim

Narcavish failed to adduce evidence sufficient to show that her termination was the result of sex discrimination. She is a member of a protected class in that she is female, she suffered an adverse employment action, she was qualified for the positon, and she was replaced by Buntman, a man. There, however, is nothing in the record to suggest the reasons given for her termination were a pretext for firing her because of her sex. For similar reasons set forth above for

Narcavish's age discrimination claim, she cannot satisfy either prong of *Fuentes*. The only evidence she points to are off-color comments made by Buntman relating to woman which are not attributable to management. (ECF No. 43 at 7). Narcavish utterly fails to tie these comments to the decision to fire her. Buntman was not a decision maker and was not present when Jones terminated her. Without any evidence tying Buntman's off-color comments to Narcavish's termination, she cannot make out pretext and no reasonable jury could render a verdict in her favor on this claim. Kindred's summary judgment motion must be granted with respect to Narcavish's sex discrimination claim.

### iii. Hostile Work Environment Claim

The court previously discussed the standard for hostile work environment claims. *See supra* at 19-20. Narcavish's hostile work environment claim appears to be based upon the one comment about her age, the off-color comments by Buntman relating to females, and a number of racially charged comments witnessed and reported by Narcavish. (ECF No. 43 at 7-8). Because Narcavish is not African-American the comments that were allegedly racist towards that race cannot support her hostile work environment claim. *See e.g.*, *Mandel*, 706 F.3d at 167 ("To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination *because of his/her* sex [race or age] . . .") (emphasis added). Taking away the racist comments, all that is left is the one comment about Narcavish's age and Buntman's off-color comments about females, of which Narcavish only testified to one or two specific examples. As already discussed, "severe or pervasive" is a relatively high standard and one that is not satisfied by a few isolated remarks. *See supra* at 20-21, 31-32. The court is constrained to conclude no reasonable jury could find that such conduct was severe or pervasive

and must grant Kindred's summary judgment motion with respect to Narcavish's hostile work environment claim.

### iv.  Retaliation Claim

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) she engaged in a protected activity; (2) her employer took adverse action after or contemporaneously with her protected activity; and (3) a causal link exists between her protected activity and the averse action. *Abramson*, 260 F.3d at 286.  If the plaintiff can establish this prima facie case, the *McDonnell Douglas* burden-shifting applies. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006).

With respect to the causal connection element of the prima facie case, the court may consider "a broad array of evidence." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000).  Unusually suggestive temporal proximity between protected activity and adverse action may be sufficient on its own to create an inference of causality.  *Id.* at 280; *see Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74 (2001).  However, "the mere fact that adverse [] action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir. 1997), abrogated on other grounds, *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 61 (2006).  If the temporal proximity is not unusually suggestive, a court may consider whether the record evidence, as a whole, is sufficient to raise an inference of causation, and in doing so may consider evidence of ongoing antagonism or retaliatory animus, inconsistencies in the defendant's articulated reasons for taking the adverse action, or any other evidence in the record sufficient to support the inference of retaliatory animus. *Farrell,* 206 F.3d

at 280.

Narcavish can demonstrate the first two elements of a prima facie case of retaliation. She suffered an adverse action when she was terminated and she engaged in protected activity when she reported racist comments to Jones and other members of management. Her brief does not, however, contain an argument about the causal connection element. (*See* ECF No. 43 at 11-13). The court cannot find any evidence in the record of retaliatory animus. To the extent Narcavish is arguing that there was unusually close temporal proximity she did not provide specifics regarding the timing or an explanation for why it was unusually close. Accordingly, on the record presented no reasonable jury could find that Narcavish established a prima facie case of retaliation.

Even if Narcavish established a prima facie case, which she did not, as already discussed in detail, she did not adduce evidence that Kindred's proffered reasons for terminating her were a pretext. The Supreme Court has recently held that a plaintiff making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2534 (2013). For similar reasons that she did not adduce sufficient evidence of pretext for her age discrimination claim, she did not adduce sufficient evidence of pretext with respect to this claim. She does not deny the behavior for which Kindred claims to have fired her, and testified that she was fired for discussing patient abuses with the medical director. Her belief that her termination was motivated by retaliatory animus is not enough to survive a summary judgment motion. *Robertson*, 914 F.2d at 382 n.12. Because Narcavish did not adduce sufficient evidence for a reasonable jury to find there was a causal connection or pretext, Kindred's motion for

summary judgment must be granted with respect to her retaliation claim.

### C.  Plaintiff Diana Reed

Reed brings claims for sex discrimination, hostile work environment, and retaliation. (ECF No. 43 at 14).

### i.  Sex Discrimination Claim

For her prima facie case, Reed can satisfy the first two elements in that as a female she is a member of a protected class and she was qualified for her position.  She did not, however, satisfy the third and fourth prongs.  Reed, who voluntarily resigned to take a higher paying job[8], avers that the adverse employment action she suffered was "she began receiving additional job responsibilities that were not part of her job as employee health and education director, causing a significant disruption in Reed's working conditions."  (*Id*. at 15).  An adverse employment action is an action which results in "a significant change in employment status, such as hiring, firing, failing to promote, *reassignment with significantly different responsibilities*, or a decision causing a significant change in benefits."  *Pagan v. Gonzalez*, 430 F.App'x 170, 172 (3d Cir. 2011) (citing *Durham,* 166 F.3d at 152–53) (emphasis added).  Here, Reed does not allege she was reassigned and the additional job duties she received can hardly be described as "significantly different."  She testified to having to add educational materials to the bulletin board and put together a newsletter.  (ECF No. 47 ¶¶ 103-104).  She admits to having prepared the newsletter on prior occasions.  (*Id*.).  No reasonable jury could find that the addition of these two responsibilities constituted an adverse action.  She, therefore, cannot make out the third element of her prima facie case.

---

[8] It does not appear from her brief that Reed is arguing that she suffered a constructive discharge.  However, to the extent she is, that claim is belied both by her testimony that she left for a higher paying job and her request to remain employed at Kindred on an "as needed" basis.

Reed failed to make out the fourth element. The alleged inference of possible sex discrimination is Reed's testimony to unspecified comments by Buntman. As discussed elsewhere in this opinion, unspecified incidents are not sufficient to survive summary judgment. *See supra* at 20-21 31-32. Reed attempts to provide two comparators who she alleges were treated more favorably with regard to correcting time card violations. (*Id.* ¶ 94). Both alleged comparators, however, are also female (*Id.* ¶ 94), and therefore do not support Reed's claim of sex discrimination. *See Carver v. D.C.I. Chippewa Clinic*, No. 2:05 CV 0122, 2006 WL 2927628, at *7 (W.D. Pa. Oct. 12, 2006) ("Carver cannot claim the other two women who rode the scooters were comparators because she and these women occupy the same protected class."). Because no reasonable jury could find Reed satisfied either the third or fourth element of her prima facie case, the court must grant Kindred's motion for summary judgment with respect to her sex discrimination claim.

### ii. Hostile Work Environment Claim

Reed does not fully lay out her hostile work environment except to say that she faced harassment and was greatly impacted by it. (*See* ECF 43 at 15-16). Reed testified to only two specific comments made by Buntman: (1) he commented on her breasts and may have joked about grabbing her pants string; and (2) he mentioned having erectile dysfunction and being unable to perform with his wife. (ECF 44, Ex. 3 (Reed Depo. at 132:13-135:10)). As discussed with respect to the hostile work environment claims brought by Collins, Narcavish, and Rose, a handful of isolated comments standing alone generally falls below the standard of severe or pervasive. *See supra* at 20-21. 31-32. The court concludes that Reed failed to adduce sufficient evidence for a reasonable jury to render a verdict in her favor on her hostile work environment

claim and must grant Kindred's motion for summary judgment with respect to that claim.

### iii. <u>Retaliation Claim</u>

As already discussed with respect to her sex discrimination claim, Reed did not show that she suffered an adverse action. The standard for adverse action on a retaliation claim is slightly different than a discrimination claim. In order for an employer's action to satisfy the second prong of a prima facie case of retaliation, the plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Daniels v. School Dist. of Phila.*, 776 F.3d 181, 195-96 (3d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). Even under that lesser standard, no reasonable jury could find that the additional job duties described above and unspecified instances of other employees "glaring" at her could be "materially adverse." The lack of adverse action similarly dooms her retaliation claim and summary judgment must also be granted on this claim.

### D. <u>Plaintiff Dianne Rose</u>

Rose appears to bring claims for hostile work environment, sex discrimination, and retaliation. (ECF No. 43 at 19-22).

### i. <u>Hostile Work Environment</u>

The court previously described the elements of a hostile work environment claim. Rose's hostile work environment claim is based upon sexist comments made by Buntman. (*Id*. at 19). Rose's amended complaint, as well as her testimony, describes four specific comments. *See supra* at 9-10. While she alleges Buntman made many other comments, she did not testify about

any other specific comments. As noted above, general claims that there were a lot of incidents are insufficient where the plaintiff did not testify about the specifics of the general claim. *Supra* at 18. This is true even where the plaintiff testified to several specific examples and went on to testify that similar conduct occurred a lot more often, but without additional specifics.[9] *See e.g.*, *Dreshman v. Henry Clay Villa*, 733 F.Supp.2d 597, 613 (W.D. Pa. 2010) ("While Plaintiff testified that he was subject to sexual harassment half of the time that he worked, when questioned about his estimate at his deposition, he only identified a number of discrete events or incidents of harassing conduct [;] thus, the Court will not credit Plaintiff's unsubstantiated estimation."); *Stephenson v. City of Phila.*, No. CIV.A. 05-1550, 2006 WL 1804570, at *11 (E.D. Pa. June 28, 2006), *aff'd*, 293 F.App'x 123 (3d Cir. 2008) (not crediting plaintiff's "unsubstantiated allegations that discriminatory treatment occurred 'all the time,'" and analyzing only the specific examples provided). Among the four comments, Buntman described a former coworker's chest and made ambiguous references to oral sex and his own genitals. (ECF No 47 ¶¶ 112-16); (ECF No. 44, Ex. 4 (Rose Depo. at 64:3-21)). The only comment that was specifically directed at Rose was that he agreed there was nothing wrong with her "ass." (ECF No 47 ¶¶ 112-16). While offensive, the court concludes that a reasonable jury could not find these four comments to be severe or pervasive. *See Grassmyer v. Shred-It USA, Inc.*, 392 F.App'x 18, 25, 30 (3d Cir. 2010) (affirming that the plaintiff's allegations that her manager regularly made comments about the size of his genitalia and about the details of his sexual relationships and referred to women as "b---hes" were not "so severe or pervasive as to support a hostile work environment claim"); *Bumbarger v. New Enter. Stone & Lime Co.*, No. CV 3:14-

---

[9] Additionally, Rose admits she did not report several of the specific comments to which she testified. Even if the court were to credit her general claim that Buntman made other comments frequently, it is not at all clear from the record to what extent she reported these other unspecified comments.

137, 2016 WL 1069099, at *15-20 (W.D. Pa. Mar. 17, 2016) (granting summary judgment for the defendant where the supervisor, among other things, touched the plaintiff on one occasion, "mooned" the plaintiff on one occasion, and called the plaintiff a "b---h" and a "c--t" several times each). In short, Buntman's conduct towards Rose falls short of the conduct other courts have found not to be severe or pervasive. Accordingly, Rose failed to adduce sufficient evidence for a reasonable jury to render a verdict in her favor on her hostile work environment claim and Kindred's motion for summary judgment must be granted with respect to that claim.

### ii. Sex Discrimination

Rose satisfied the first three elements of a prima facie case for her sex discrimination claim in that she is a member of a protected class as a female, she was qualified for her position, and she suffered an adverse employment action when she was terminated.[10] Even assuming that Buntman's off-color comments give rise to an inference of sex discrimination and thus satisfy her prima facie case, the court agrees with Kindred that Rose failed to adduce evidence of pretext.

Kindred's proffered legitimate nondiscriminatory reason for terminating Rose is the last of her multiple performance improvement plans and written warnings which stemmed from an incident where she allegedly refused to medicate a patient. (ECF No. 47 ¶¶ 134-38); (ECF No. 42-7 at 42-43 (Performance Improvement Form)). The court previously described the two-prong test from *Fuentes* used in analyzing pretext. *See supra* at 23-25 To reiterate, the *Fuentes* test requires a plaintiff to show that a factfinder could reasonably either (1) disbelieve the employer's

---

[10] Rose appears to argue that her termination is the only adverse employment action she suffered. (*See* ECF No. 43 at 20). To the extent she argues that her allegations that she was treated differently with regard to scheduling also constitute an adverse employment action, those allegations are unsupported by the record in that she did not testify about any specifics and no actual schedules or other evidence was adduced, and she claims that two men and *four women* were treated better with respect to scheduling. (ECF No. 42-7 at 27-28 (Rose Depo. 83:11-25, 95:1-9)).

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764.

Rose cannot satisfy either *Fuentes* prong. As with most of her other performance improvement plans and written warnings, Rose denies the precipitating misconduct for the final warning that Kindred avers led to her termination. That, however, is not enough to show pretext. The existence of the performance improvement plan is undeniable, as is the fact that it is signed by Egan, a female and not the person Rose alleges discriminated against her. In cases such as this, the issue is not whether Rose in fact failed to medicate her patient, but whether there is any evidence Kindred did not believe she failed to do so when it terminated her. *Watson v. SE Penn. Transp. Auth.*, 207 F.3d 207, 222 (3d Cir. 2000) ("The employment discrimination laws involved here permit an employer to take an adverse employment action for a reason that is not 'true' in the sense that it is not objectively correct." The issue is whether the employer sincerely believes the employee engaged in the misconduct or is motivated by discriminatory animus); *Riley v. St. Mary Med. Ctr.*, No. CV 13-7205, 2015 WL 5818515, at *12 (E.D. Pa. Oct. 6, 2015). Because Rose failed to make any showing that Kindred did not sincerely believe she failed to medicate her patient, she cannot satisfy the first prong of *Fuentes*. Rose similarly cannot satisfy the second prong from *Fuentes*. The only evidence of record that could even arguably show an "invidious discriminatory reason" for her termination is the off-color comments made by Buntman. As already discussed, "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision." *Parker*, 309 F.App'x at 558-59 (quoting

*Fuentes*, 32 F.3d at 767). Because Rose failed to adduce sufficient evidence of pretext for a jury to find in her favor on this claim, Kindred's motion for summary judgment must be granted with respect to Rose's sex discrimination claim.

### iii. <u>Retaliation</u>

Rose established the first two elements of a prima facie case of retaliation. She engaged in a protected activity when she reported the one comment to Narcavish in November 2011 and she suffered an adverse action when she was terminated.[11] Rose's only argument regarding the third prong, a causal link between the adverse action and the protected activity, however, seems to be that there was close temporal proximity, of roughly four months. "[A]n undeniably short period of time" between the protected activity and adverse action, standing alone, is not necessarily probative of retaliatory animus. *See Kahan v. Slippery Rock Univ. of Pa.*, 50 F.Supp.3d 667, 702-03 (W.D. Pa. 2014), reconsideration denied sub nom., 2014 WL 7015735 (W.D. Pa. Dec. 11, 2014) (three weeks between the two events). "The majority of the case law supports a conclusion that [a one-month gap] is not unusually suggestive." *Thomas-Taylor v. City of Pittsburgh*, No. CIV.A. 13-164, 2014 WL 4079944, at *8 (W.D. Pa. Aug. 18, 2014), *aff'd*, 605 F.App'x 95 (3d Cir. 2015); *see Yu v. U.S. Dep't of Veterans Affairs*, 528 F.App'x 181, 185 (3d Cir. 2013) (finding that "unusually suggestive" means "within a few days but no longer than a month"). Under the relevant case law, the four-month period between reporting to Narcavish and Rose's termination is not unusually suggestive of retaliatory animus. This is especially true given Rose's termination closely followed her receipt of the performance improvement plan for refusing to medicate her patient. Absent further evidence the court is

---

[11] Rose claims there were other instances where she reported or complained of Buntman's conduct; however, she did not testify to specific examples besides reporting the November 2011 comment to Narcavish.

constrained to conclude that Rose did not establish a prima facie case of retaliation.

Even if the court were to find that Rose satisfied the third element of the prima facie case, which it does not, as already discussed with respect to Rose's other claims, she did not adduce sufficient evidence for a reasonable jury to find that Kindred's proffered reason for firing her was a pretext. The court previously described at length the two-prong test from *Fuentes* used in analyzing pretext. *See supra* at 23-25. To reiterate, the *Fuentes* test requires a plaintiff to show that a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764. The fact that Rose denies refusing to medicate her patient is insufficient. *Watson*, 207 F.3d at 222; *Riley*, 2015 WL 5818515, at *12. There is no more evidence that her termination was really motivated by retaliatory animus than there is evidence it was motivated by discriminatory animus. On the record presented, no reasonable jury could find a causal connection between her protected conduct and the adverse action or that there was pretext; Kindred's summary judgment motion must be granted with respect to her retaliation claim.

### E. Plaintiff Terri Welch

Although the section of plaintiffs' brief about Welch's claim is not clear, Welch appears to bring an age discrimination claim and sex discrimination claim. (ECF No. 43 at 22).

### i. Age Discrimination Claim

To establish a prima facie case of age discrimination a plaintiff must show: (1) she is age forty or older; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was replaced by an "employee who was sufficiently younger to

support an inference of discriminatory animus." *Smith*, 589 F.3d at 689. Welch satisfied the first element and points to her August 22, 2013 termination from PRN status as the adverse employment action she suffered. Although she attempts to satisfy the fourth element using alleged comparators who were not held to Kindred's policies regarding lunch breaks and use of cell phones on duty, these actions are not what Welch claims are the adverse action in her situation.[12] (*See* ECF No. 43 at 22-25). Welch did not allege that she was replaced on the PRN list by an employee younger than she is, only that younger employees were permitted to use their phones and eat lunch without clocking-out. Furthermore, she testified that she did not know the ages of her alleged comparators, but estimated them generally as forties or early fifties. (ECF No. 42-8 at 8 (Welch Depo. at 24:2-14)). It is not clear from the record how old Welch was at the time the alleged comparators were permitted to use their cellphones and not clock-out, but Welch's age while employed at Kindred ranged from 51 to about 60 years old. Therefore, it is possible the alleged comparators were significantly younger than Welch and possible that they were roughly the same age.

Even if the court were to assume Welch satisfied the fourth element of the prima facie case, she did not adduce sufficient evidence to demonstrate pretext. The court previously described the two-prong test from *Fuentes* used in analyzing pretext. *See supra* at 23-25. To reiterate, the *Fuentes* test requires a plaintiff to show that a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the

---

[12] Even if she were, actions such as not allowing her to eat lunch without clocking-out or not allowing her to use her cell phone on duty, without more, do not rise to the a level sufficient for a reasonable jury to find they are adverse actions. An adverse employment action is that which is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey,* 390 F.3d at 764.

employer's action. *Fuentes*, 32 F.3d at 764. Kindred's proffered reason for terminating her as PRN status was her failure to work at least one shift every month, in violation of the hospital's policy. (ECF No. 47 ¶¶ 159-60). Welch's only response is to claim that no one ever told her about that requirement. (*Id*. ¶¶ 159-60). Even when taken as true, the contention that she was unaware of the policy does not by itself prove that Kindred either did not have such a policy or used the policy as a pretext. Absent more, Welch failed to adduce sufficient evidence for a reasonable jury to find that Kindred's reasons were pretextual. Accordingly, the court must grant Kindred's motion for summary judgment as it relates to Welch's age discrimination claim.

### ii. Sex Discrimination Claim

Welch's argument for her sex discrimination claim is even more difficult to ascertain. It, however, fails for similar reasons that her age discrimination claim fails. In addition, besides having no alleged comparators for her loss of PRN status, the alleged comparators she points to for the other issues were all female. Accordingly, they cannot support a claim of sex discrimination. Nothing else in the record besides Buntman's one comment regarding wiping the lint off of her even suggests discriminatory animus on the basis of her sex. She, therefore, failed to adduce sufficient evidence for a reasonable jury to find she made out the fourth element of the prima facie case for sex discrimination. For similar reasons described above, Welch did not demonstrate pretext. Because Welch failed to adduce sufficient evidence for a reasonable jury to find she made out a prima facie case or pretext, the court must grant Kindred's summary judgment motion with respect to her sex discrimination claim.

## V.    **CONCLUSION**

For the foregoing reasons, judgment will be entered in favor of Kindred with respect to all claims asserted by each plaintiff.

An appropriate order follows.


Dated:          August 12, 2016

/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge
